1   Tina Wolfson (SBN 174806)
    *twolfson@ahdootwolfson.com*
2   Robert Ahdoot (SBN 172098)
    *rahdoot@ahdootwolfson.com*
3   Theodore W. Maya (SBN 223242)
    *tmaya@ahdootwolfson.com*
4   Carlynne A. Wagner (*pro hac vice* forthcoming)
    *cwagner@ahdootwolfson.com*
5   **AHDOOT & WOLFSON, PC**
6   2600 West Olive Avenue, Suite 500
    Burbank, California 91505
7   Tel:   (310) 474-9111
    Fax:   (310) 474-4521
8
9
10  *Attorneys for Plaintiff and the Putative Class*

11

12                  **UNITED STATES DISTRICT COURT**

13                **NORTHERN DISTRICT OF CALIFORNIA**

14                        **SAN JOSE DIVISION**

15

16  MICHAEL STELLMAN, individually and on          Case No.
    behalf of all others similarly situated,
17
                        Plaintiff,                 **CLASS ACTION COMPLAINT**
18
              v.
19
    GOOGLE LLC and ALPHABET INC.,
20
                        Defendants.
21

22                                                 DEMAND FOR JURY TRIAL

23

24

25

26

27

28

---

CLASS ACTION COMPLAINT

Plaintiff, acting individually and on behalf of all others similarly situated, brings this action for damages and equitable relief against Defendants Google LLC and Alphabet Inc. (collectively, "Google").

## I.  NATURE OF THE CASE

1.      Google is an advertising company that makes billions of dollars a year by deceptively using individuals' personal information to engage in targeted digital advertising. Google has extended its reach from search advertising to dominate the online advertising landscape for image-based ads on the web, called "display ads." In their complexity, the markets for display ads resemble the most complicated financial markets: publishers and advertisers trade display inventory through brokers on electronic exchanges and networks at lightning speed. Google is a company standing at the apex of power in media and advertising, earning revenue over $65 billion per quarter, or $712 million per day, almost all from advertising.

2.      Google's advertising apparatus extends across the "ad exchanges" and brokers through which display ads trade. Indeed, nearly all of today's online publishers (be they large or small) depend on one company—Google—as their middleman to sell their online display ad space in ad exchanges, i.e., the centralized electronic trading venues where display ads are bought and sold. Conversely, nearly every consumer goods company, e-commerce entity, and small business now depends on Google as their respective middleman to purchase display ads through exchanges in order to market their goods and services to consumers. In addition to representing both the buyers and the sellers of online display ads, Google also operates the largest exchange, AdX.

3.      Google increased its exchange fees by surreptitiously implementing a secret auction-manipulation program known as "Reserve Price Optimization." As explained further below, this program operated to override publishers' exchange floor prices and deceptively increase the amount advertisers must pay for impressions on AdX.

4.      Like the other class members, Plaintiff dealt directly with Google in its capacity as display advertising broker, having placed online display and search advertisements using Google's services. Plaintiff, like the other class members, suffered economic losses as a result of Google's unfair and deceptive Reserve Price Optimization program, and seeks appropriate equitable relief and damages

through this action.

## II.    JURISDICTION AND VENUE

5.    This Court has diversity jurisdiction over this action under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one class member is of diverse citizenship from Defendants, there are more than 100 class members nationally, and the aggregate amount in controversy exceeds $5,000,000.

6.    Venue is proper in this District under 28 U.S.C. § 1391. Google's principal place of business is in this District, and it regularly conducts business here. A substantial part of the events giving rise to Plaintiff's causes of action occurred in or emanated from this District.

7.    Assignment to the San Jose Division is appropriate under Local Rule 3-2(c) because a substantial part of the conduct at issue in this case occurred in Santa Clara County.

## III.    PARTIES

8.    Plaintiff Michael Stellman is an individual based in Los Angeles, California. During the class period, Plaintiff paid Google directly to broker the placement of his display advertisements on third-party websites.

9.    Defendant Google LLC is a limited liability company organized under the laws of Delaware with its principal place of business in Mountain View, California. Google LLC is a technology company that provides internet-related services and products, including online advertising technologies and a search engine.

10.    Defendant Alphabet Inc. is a corporation organized under the laws of Delaware with its principal place of business in Mountain View, California. Google LLC is a wholly-owned subsidiary of Alphabet.

11.    Google LLC and Alphabet Inc. are collectively referred to herein as "Google."

## IV.    FACTUAL ALLEGATIONS

### A. Overview of the Digital Advertising Market

12.    Businesses have long relied on advertising to promote their products, generate brand awareness, and increase sales. In the digital age, businesses now aim to target not just a generalized audience with a shared characteristic, but individuals with unprecedented precision. Digital advertising

is automated and data-driven, involving data scientists, mathematicians, and computer programmers who, behind the scenes, use advanced statistics and consumer behavioral tracking tools to optimize advertising campaigns and constantly tweak algorithms that micro-target users.

13.    Digital advertising is now the fastest growing segment of the advertising business in the United States. More than half of all advertising money in the United States is now spent on digital advertising—estimated at approximately $165 billion in 2022.

14.    Search advertising is the placement of advertisements above or alongside the organic search results generated by a search engine (i.e., Google). Search advertisements target recipients based on the search terms a web user inputs into the search engine. The advertiser pays when the user clicks on the advertisement, based on a cost per click. For example, if a user searches for sandwich delivery, the search advertising results may look like this:



CLASS ACTION COMPLAINT

15.     In contrast to search advertising, display advertising is not based on an internet user's search terms, but on specific data and characteristics about the individual who is sees a webpage. Display advertising comes in many forms, including banners, images, and videos. Display ads appear next to content on websites and on mobile applications ("apps"). For instance, an ad for Dove soap might appear as a banner or sidebar on the cooking website "myrecipes":



16.     Suppliers of display advertising are website operators and are known as publishers (*e.g.*, providers of online news sites and other content creators). Publishers employ third-party tools to find advertisers to purchase ad inventory available on their websites.

17.     Real time bidding ("RTB") is a form of programmatic buying and means exactly what the name implies: a real time bidding system. In less than 120 milliseconds, RTB allows publishers to monetize the advertising space available on their website by selling them to buyers through an auction system.

18.     Approximately 86% of online display advertising space in the United States is bought and sold in real time on electronic trading venues, referred to in the industry as "advertising exchanges" or programmatic real-time bidding. Ad exchanges conduct automated auctions of publisher inventory of

display ads, also known as impressions.

19.     When an internet user clicks to visit a web page, in the milliseconds that it takes for that page to load, real-time auctions are occurring in the background to determine which ads will display on the web page that a particular user will see. Specifically, the publisher's ad server sends a "bid request" to the ad buying tools who have a "seat" to bid in the exchange and purchase on behalf of their advertiser clients. This bid request announces the publisher's available impressions to exchanges, along with information about the impression, including the user's ID, the ad slot's parameters, and any rules about pricing. These bid requests also contain information about the impression at issue and convey a "timeout," which is the amount of time prospective buyers are allotted to respond with their "bid response." Within this timeframe, which is typically a mere fraction of a second, each ad buying tool must unpack the information contained in the bid request, gather and deploy personal information about the user, determine the appropriate price to bid on behalf of the prospective advertiser, and return a bid response to the exchange. When time expires, each exchange closes its auction, excludes any late bids, and passes its highest bid to the ad server. The publisher's ad server then selects which ad to display and effectuates the display of the ad to the user.

20.     These auctions are run by supply-side platforms (SSPs), exchanges, and demand-side platforms (DSPs).

21.     On the supply side of the exchange, suppliers—online publishers—of display advertising employ publisher ad servers (PAS) to accept, store, and manage ads; choose where and when ads appear; and track the effectiveness of ad campaigns. Each specific ad placement is determined based on bids from advertisers and/or preexisting arrangements between publishers and advertisers. Publishers rely on supply-side platforms (SSPs) to run auctions, interface directly with their demand-side equivalents, and optimize available inventory.

22.     The demand side is comprised of advertisers and media agencies running advertising campaigns for businesses. Advertisers and media agencies rely on ad-buying tools to store ads, deliver them to publishers, and record transactions. Larger advertisers and media agencies employ sophisticated ad-buying tools known as demand-side platforms (DSPs) to purchase digital advertising by bidding in auctions and to manage their bids.

23.     The ad-buying tools connect to an ad exchange, which combines inventory from ad networks and SSPs with third-party data from a data management platform or data broker. When an ad space on a publisher's site becomes available, the ad exchange holds an auction in which the DSP bids on the impression submitted by the ad network or SSP. These intermediary services consist of display ad exchanges and display ad networks. Ad exchanges serve as the middlemen connecting publishers' ad servers on the sell-side to advertisers' buying tools on the demand-side.

24.     In order to display a specific, targeted ad to a particular user, the ad server assigns a unique user ID to each web user, which allows the publisher, the ad exchange and the advertiser to know the particular characteristics of that user. An advertiser can link the ID to a specific identity and certain characteristics about the user such as where she lives and what products she has purchased. The user ID allows the advertiser to target a specific ad to that ad space that the user is viewing. It also allows the advertiser to track whether the user clicks on an ad or purchases a product and allows the advertiser to cap the number of times a user is shown a particular ad.

25.     Together, the set of intermediary exchanges and platforms that advertisers and publishers use to buy, sell, and place display ads ("intermediation" services), including publisher ad servers (PAS), supply-side platforms (SSP), and advertisers' ad-buying tools and demand-side platforms (DSP), comprise what is known as the "ad tech stack."

26.     Ad exchanges charge publishers a share of transaction value, known as a "take rate," to facilitate the transaction, which has ranged from 5 to 20 percent (or more) of the inventory's clearing price. At the clearing price, the publisher is willing to sell, and the advertiser is willing to buy. The economic surplus from the transaction is split between the advertiser, the publisher, and the exchange, depending on the rules of the auction and the take rate charged by the exchange. The exchange take rate reduces the surplus available for the advertiser and the publisher: a higher take rate reduces the number of ads the advertiser purchases and the advertising revenue received by publishers. For example, in a second-price auction, the advertiser's surplus would be the difference between their bid (which reveals their willingness to pay) and the second-highest bid (the clearing price), and the publisher's surplus is the difference between their price floor (the minimum amount at which they are willing to sell) and the clearing price. Both advertiser's and publisher's surpluses are reduced by the exchange's take rate.

27.    Trading in exchanges provides large publishers and advertisers with significant (and unique) controls to reduce problems of adverse selection, thereby increasing welfare and increasing output. For instance, publishers can increase price floors on informed traders. This encourages advertisers to bid for their inventory and increases the prices at which publishers' inventory ultimately clears at auction. On the buy-side, advertisers can bid on and purchase individual impressions to reduce waste and target more effectively. Together, these features reduce instances of information asymmetry that lead to adverse selection problems, thereby resulting in increased market output and improved overall welfare.

28.    Given the importance of programmatic advertising and real-time bidding in the digital advertising market, it is important to understand the distinction between first-price auction setting and second-price auction setting.

29.    In the first price-auction model, bidders participate in the auction simultaneously, and the highest bidder wins. The highest bidder pays the exact price per thousand ad impressions that he or she bid during the auction. The winning bid is also known as the clearing price.

30.    To exemplify the first-price auction, we can imagine three bidders participating in an auction (A, B, and C). Each of the three bidders set a price of how much they are going to pay for 1000 ad impressions: Bidder A = $3, Bidder B - $5, and Bidder C = $4. The highest bid in this auction is $5, so Bidder B win the auction and pays $5 per 1000 ad impressions to the publisher.

31.    First-price auctions generally favor publishers during the transaction because publishers earn more revenue without the bid being reduced.

32.    While the first-price auction mechanism gives publishers the highest bids for their inventory, it can lead to unnaturally high prices as buyers are forced to "guesstimate" how much their competition bid. This, in turn, can lead to overpaying and a lower demand for publishers' inventory.

33.    For this reason, the second-price auction model is widely applied in the world of programmatic advertising. It has allowed advertisers to bid high prices to secure impressions, but ultimately pay a lower clearing price.

34.    In the second price auction model, as in a first, the highest bidder wins. However, the final price is not equal to the winner's initial bid, but just $0.01 more than second-highest bidder's bid.

35.    eBay, one of the first companies to create and market an Internet web site to match buyers and sellers of goods and services implements a second-price auction, in which the highest bidder wins the object, but pays a price equal to a modest increment above the second-highest bid.

36.    Again, for example, three bidders participate in the auction (A, B, and C). Their bids remain the same: Bidder A = $3, Bidder B - $5, and Bidder C = $4. The highest bid in this auction again is $5, so Bidder B wins the auction. However, in a second-price auction, Bidder B will only pay $4.01 for each 1000 ad impressions. The difference a winning bidder saved on the impression is called reduction. In this example, the reduction amounts to $0.99 ($5 - $4.01).

37.    The main difference between first-price and second-price auctions is that in a second-price auction, publishers receive less ad revenue because the process leads to a reduction in bids. For this reason, sometimes publishers set floor prices which act as a threshold against which the bids are counted. Floor prices aim to increase the closing bid.

38.    The floor price, also known as the reserve price, is the minimum amount for which the seller is willing to sell an item. If the reserve price isn't met, the item will not be sold.

39.    The role of the ad exchange is critical in display advertising. Exchange transactions are the means by which website publishers monetize the attention they earn from web users and advertisers can maximize the impact of their ad spend. A competitive and transparent ad exchange is therefore essential to parties on both sides of the ad stack.

40.    Relying on intermediaries like Google that route buy and sell orders from advertisers and publishers, the structure of the ad market resembles the structure of electronically traded financial markets. Just as individual investors trade on financial exchanges through an intermediary brokerage firm, so must publishers and advertisers go through a computerized intermediary to trade on advertising exchanges. But in display advertising, a single company, Google, simultaneously functions as the key intermediary through which buyers (advertisers) and suppliers (publishers) of display advertising trade, and as a leading publisher of advertisements in its own right.

**B. Google Becomes the Dominant Search and Display Ad Exchange: AdX**

41.     With about nine out of ten internet searches using Google's search engine, Google is the dominant source for search advertising. As a result, companies seeking to promote their products or services online have little or no choice but to purchase search advertising space from Google. Google owns the data, the tools, and a significant share of the publishing sites to which advertisers need access in order to participate in any display advertising campaign.

42.     Because search advertising targets users who have already shown some interest in the product or service from their search, few online advertising campaigns bypass online search as a platform for marketing. Search advertising accounts for at least part of the ad spend of nearly every advertiser engaged in online advertising.

43.     Google rapidly rose to become the dominant supplier in the search and programmatic display advertising market. Specifically, Google's display advertising revenue is derived from Google's position as an intermediary in the sale of ad space on third-party websites to advertisers and from ads placed on Google's own properties, such as Google Maps and Google Shopping.

44.     As the owner of the dominant online search platform, Google is by far the largest supplier of digital search advertising in the United States. Over the last ten years, Google's share of the digital search advertising supply has ranged between 89% and 93%.

45.     Google's revenue from display advertising is earned through (a) its role as an intermediary in the sale of ad space on third-party websites to advertisers and (b) from ads placed on Google's own properties (e.g. Google Maps, Google Shopping, AMP, YouTube).

46.     One of Google's key sources of revenue derives from its activities as the broker between publishers and advertisers in programmatic display advertising. When an ad is viewed on a third-party publisher's site, Google pays the publisher a share of the amount the advertiser paid to Google. The amount of revenue Google earns from display advertising is dependent on the number of ads it sells, the price of those ads, and Google's percentage margin or "cut" of the deal, also known as the "take rate."

47.     The "take rate" is the difference between what an advertiser pays for an ad and what portion of that payment the publisher of the ad receives for placing the ad on its website. Google's take rate as an intermediary is typically 54-61%. When ads are presented on Google products, such as Google

Search or YouTube, Google keeps the entire price of the ad.

48.     Google has a strong economic incentive to increase the number of ads placed on its proprietary sites, to charge advertisers higher prices, and to pay as little as possible to publishers displaying ads placed through Google on their websites.

49.     The Google ad exchange, called AdX, processes about 11 billion online ad spaces each day. In Google's words, "[h]undreds of thousands of publishers and advertisers use [Google's] AdX [exchange] to transact inventory, and more daily transactions are made on AdX than on the NYSE and NASDAQ combined."[1] At the same time, Google owns the largest buy-side and sell-side brokers. As one senior Google employee admitted, "[t]he analogy would be if Goldman or Citibank owned the NYSE."

50.     Some 80 percent of the publishers using Google's ad server also contracted with Google's exchange. Since 90 percent of publishers were using Google's ad server, this means that the large majority of available publisher customers were using Google's exchange—for publishers, Google's exchange was unmissable.

51.     In 2019, *The Wall Street Journal* reported that AdX was "the world's largest [exchange] with about half [of] the [overall worldwide] market share." Since AdX is used by more publishers, transacts more revenue, and transacts more volume in the United States than in other countries, according to Google's internal documents, this means that AdX controls substantially more than half of the United States exchange market. Indeed, AdX transacted *more* than half of display impressions in the United States during this time period. In the twelve months leading up to October 2019, AdX transacted over 60 percent of all display inventory sold through exchanges in the United States.

52.     Google's AdX is not the only exchange in the United States, but its closest competitors (exchanges offered by Rubicon, Xandr, and Index Exchange) each have considerably lower shares of the market. For example, between 2018 and 2019, the increase in AdX's transacted revenue was about

---

[1]     Plaintiff relies on the publicly available Third Amended Complaint by states in *In re: Google Digital Advertising Antitrust Litigation*, Civil Action No.: 1:21-md-03010-PKC (S.D.N.Y.), for all direct quotes contained in this Complaint. Plaintiff is informed and believes that all quotations included in the above-referenced complaint were verified and accurately represent statements by Google.

1   *five times* the value of the increase for Xandr, further amplifying the relative size difference between

2   AdX and its closest competitors.

3       53.     Google also operates "Google Ads," which is the largest ad buying tool for small

4   advertisers.

5       54.     When an advertiser establishes a Google Ads account to use in placing search

6   advertisements, Google Ads is set as the default account for placing both search *and* display

7   advertisements.

8       55.     Google's policies and monopolistic conduct (which is the subject of various antitrust

9   actions against it) have made it virtually impossible for an online marketer to operate independently

10  from the Google ad stack, particularly given Google's dominance in the ad-buying, ad server, ad

11  exchange, site analytics, and other submarket segments.

12      56.     On the supply side, Google restricts publishers' ability to access the bid data required to

13  compare the performance of Google's exchange with rival exchanges. And Google does not reveal to

14  other market participants its own fees and commissions on transactions. This lack of transparency that

15  Google has imposed across the ad stack undermines the ability of both advertisers and publishers to

16  make the informed decisions necessary to operate effectively in the marketplace.

17      57.     Google claimed, until September 2019 that it priced its advertising through a class

18  second-price auction.

19      58.     Google's reserve-price optimization practices caused advertisers to pay higher prices.

20      59.     In its online ad auctions, a publisher may set a reserve or floor price, which corresponds

21  to a minimum bid that is needed to win a particular ad placement. If none of the bids exceeds this reserve

22  price, the winning bidder *must* pay the reserve price—a price that, by definition, is higher than the price

23  that would have won the placement in an auction in which the publisher had not set a floor price. In fact,

24  the majority of winning bids by advertisers are at the reserve price.

25      60.     When advertisers pay supra-competitive fees to brokers like Google for placing ads, they

26  pass on a portion of those costs to their customers by marking up the prices of their goods and services.

27  And when publishers receive anticompetitive underpayments for running ads, they are often forced to

28  cut costs, including through layoffs, and hence cannot produce content of the same quality or variety.

Finally, by eliminating competition, Google's display advertising monopoly also has reduced the incentive to innovate in these markets and thereby deprived the public of the benefit of improvements in advertising services and delivery.

61.    Advertisers have suffered harm by paying higher prices due to Google's display advertising control. During the class period, increases in the prices paid by advertisers to place online display ads have outpaced the rate of inflation as a result of Google's ability to inflated prices free from any realistic competitive threat as a necessary check.

62.    The investigation conducted by the House Subcommittee on Antitrust, Commercial, and Administrative Law revealed that many companies pay Google most of their online ad expenditures. For example, one major company paid well over half of its total ad spend to Google each year from 2016 to 2019, with the second top provider receiving less than 15%.

63.    A 2018 study by eMarketer, which focused on programmatically purchased ads across the open internet, found that programmatic ad prices have risen meaningfully across all major display categories: desktop, mobile, mobile app, and video. In 2018, the average digital advertisement sold for 12% more than it did in 2016, an increase approximately five times the prevailing rate of inflation. These price increases resulted in substantial part from Google's consolidation of the intermediation services market and Google's price increases for those services, and were largely borne by advertisers who paid Google for those services to broker the placement of their display ads.

64.    *Bloomberg* also reported that as of 2019, Google had increased the price of search ads by about 5% annually, a rate more than three times greater than the 1.6% inflation rate during the same time period.

**C. Google Purports to Run a Second-Price Auction to Attract Advertiser Participation to AdX**

65.    In its external marketing of its exchange to publishers and advertisers, Google explained that an ad exchange is "just like a stock exchange, which enables stocks to be traded in an open way." But this is not what Google's exchange, AdX, did.

66.    Between 2010 and September 2019, Google led publishers and advertisers to believe that AdX was a second-price auction. By advertising its auction as a second-price auction, Google induced

bidders to reveal the maximum each would be willing to pay for a particular impression (what economists commonly call "true value"). It is well-established and well-known that the dominant bid strategy in sealed-bid, second-price auctions is to bid one's true value. This is because revealing the maximum one is willing to pay is not harmful. Bids are "sealed" and, in the event one outbids others, they pay only the second-highest price, effectively masking the true value the bidder was willing to pay.

67.     Google's Group Product Manager Scott Spencer drove this point home in a 2010 AdExchanger.com interview. He promoted that a second-price auction "incentivizes buyers to bid the most that they're willing to pay for a given piece of inventory and it minimizes the need to 'game' the system." That is, bidders can feel safe revealing their maximum bid and do not need to spend resources guessing what others will bid.

68.     In a 2014 paper titled "Yield Optimization of Display Advertising with Ad Exchange" (published in the *American Economic Review*), Google senior researchers Jon Feldman, Vahab Mirrokni, and S. Muthukrishnan similarly promoted AdX: "With multiple bidders, AdX runs a sealed bid second- price auction." No doubt, publishers and advertisers were led by Google to believe that when AdX ran an auction, the highest bidder would win and pay the amount of the second-highest bid.

69.     Google falsely told market participants that its AdX exchange ran a transparent second-price auction that "is the most efficient auction model, resulting in the most stable, long-term equilibrium price."

70.     Consequently, when bidding into AdX, advertisers revealed the maximum they would be willing to pay for each impression, bidding their true value. They did so because they relied on Google's misrepresentations that AdX ran a second-price auction and that revealing this information would not be used against them.

71.     Google secretly manipulated the auction through a subversive program: Reserve Price Optimization.

72.     In 2015, Google's "gTrade" group implemented a program called Reserve Price Optimization ("RPO") that overrode publishers' exchange floors and thereby deceptively increased the amount advertisers paid for impressions on Google's AdX exchange.

73.     Through RPO, Google abused advertisers' trust and secretly used their true value bids

against them. RPO overrode publishers' AdX exchange floors (which Google induced publishers to pre-set in their DFP ad servers) and generated unique and custom per-buyer floors depending on what a buyer had bid in the past. The manufactured RPO floors acted as false second-highest bid, which forced advertisers to pay more than they otherwise would have paid.

74. For instance, suppose a publisher set a $10 price floor for bids coming through AdX. An impression targeted to John Connor becomes available. In AdX, Buyer A bids $15 for that impression, Buyer B bids $12, and Buyer C bids $11. Buyer A wins the impression at the amount of the second-highest bid, or $12. This is consistent with how Google represented its auctions work. But in the *next* auction for an impression targeted to John Connor, RPO would use an advertiser's past true value bids to its detriment. In the next auction RPO would override the $10 floor set by the publisher and, instead, send Buyers A, B and C a floor of $14.90, $11.90, and $10.90, respectively—a unique and custom floor based on what each buyer had bid in the past for John Connor's impressions. If Buyers A, B, and C return their expected bids of $15, $12, and $11, Buyer A still wins. But instead of paying the $12 owed under the rules of a second-price auction, Buyer A would pay $14.90—the increased price coming not from an actual competing bidder, but through the artificial and manipulated bid of the RPO floor.

75. To guess how much each advertiser would pay for a specific impression, RPO relied on inside information: advertisers' historic bids into Google's supposedly second-price exchange auction, as well as publishers' ad server user IDs. Google employees privately acknowledged that RPO should be based on "smarts and tech" rather than "insider information," even as Google's own RPO implementation leveraged Google's "insider information" in the form of user IDs derived from the Google publisher ad server and bid history data from AdX.

76. RPO clearly harmed advertisers by forcing them to pay more than they would have if Google had run a true second-price auction, as it advertised. By falsely representing that its AdX exchange was a second-price auction, Google induced advertisers to bid their true value, only to override publishers' pre-set AdX floors and use advertisers' true value bids against them. This meant that AdX did not function as a second-price auction—a fact that Google employees flagged with concern internally.

77. Google launched RPO in early 2015 and automatically opted publishers into the program.

78.     Around the same time, Google publicly and falsely denied plans to launch dynamic floors in its exchange. On March 5, 2015, Digiday ran a story based on a leak about Google's potential plans to launch dynamic price floors. The publication asked Google whether it planned to adjust price floors based on publishers' use of Google's DFP ad server. In response, spokeswoman Andrea Faville issued a statement: "That description doesn't match anything in our current product suite or future roadmap." Ms. Faville's statement directly contradicted Google's internal operations. Internally, Google planned to launch RPO weeks later for 50 percent of publishers by April 7 and for 90 percent by April 17.

79.     Google continued to mislead publishers by encouraging them to adjust Google exchange floors in their publisher ad server. DFP continued to let publishers pre-set floors for Google's AdX exchange, buying tools, and advertisers, directly leading them to believe that they could control outcomes and optimize yield through floors.

80.     Over a year later, on May 12, 2016, Google announced it was launching "optimized pricing." However, Google did not disclose that it had actually launched RPO over a year earlier, did not disclose that RPO relied on inside information, and misled publishers and advertisers as to how the program worked.

81.     Google misled advertisers and publishers, and misrepresented how the program worked. In its blog post disclosing RPO, Google claimed that it would "monitor [optimized pricing's] performance to ensure advertisers continue[d] to get great ROI" and that it would "give programmatic buyers greater access to premium inventory." Google also approached select large, sophisticated buyers on a one-on-one basis representing that the dynamic floors were good for them. Google kept a record of these conversations and advertiser responses. According to Google's records, one advertiser pushed back, asking "How is this good for the buyer? Because, I'll tell you, it isn't. It just raises the price." Google responded misleadingly by saying that the program helps advertisers by increasing the amount of inventory available for purchase programmatically. Privately, employees acknowledged that RPO did not help advertisers at all.

82.     All the while, Google continued to lead advertisers and publishers to believe that AdX operated a second-price auction, inducing advertisers to submit a sealed bid reflecting their true value. Numerous industry articles covering Google's conduct in the exchange market continued to report that

Google operated a second-price auction. Internally, Google employees discussed public perception around AdX operating as a second-price auction. It was not until 2019 that Google publicly migrated to a first-price auction, discarding all pretense of running a second-price auction.

83.    Google's internal documents reveal that Google was aware of the resulting deception and harm in the market. In an email between colleagues discussing RPO, a Google employee wrote: "Doesn't that undermine the whole idea of second price auctions? I.e., the assurance that you can bid the maximum you're willing to pay with no negative consequence. But if the publisher manufactures a floor based on your bid to get you to pay more than the second price, this principle gets violated. It'll transform the system into a 1st price auction where the bidder has a strong incentive to bid LESS than he's willing to pay. (Only just enough to win.) I don't think that's desirable for either side in the long term." Another employee wondered: "Is RPO not just basically pushing our second price auction - that is supposed to be fair - toward a first priced auction?"

84.    Google did not give publishers the option to turn off RPO. Internal Google documents suggest that RPO continues in some form after Google's migration to a first-price auction under the codename "Bulbasaur," a reference to the Pokémon green monster that is half frog and half poisonous plant.

85.    RPO impacted billions of impressions sold by publishers and transacted by Google's exchange. Google ran an experiment measuring the impact of RPO on exchange competition, finding that RPO netted Google an additional $250 million of annual recurring revenue. Because RPO made use of publishers' ad server user IDs, it exacerbated problems of adverse selection between exchanges and foreclosed competition for pricing. Simultaneously interfering with publishers' ability to access and share their ad server user IDs, RPO ensured that no competing exchange could adjust floors like Google did in its AdX exchange. Further, concealing the fact that RPO relied on inside information (e.g., use of publishers' ad server user IDs) preempted publishers and advertisers from switching to transacting in more efficient, transparent exchanges. Instead, publishers and advertisers continued to use AdX, accelerating its scale and network effects, all the while under the impression that AdX was an authentic second-price auction.

86.    Google compounds its auction manipulation by purposefully keeping its auction

mechanics, terms, and pricing, opaque and "nontransparent" to both advertisers and publishers. This makes it nearly impossible for advertisers and publishers to discover Google's misrepresentations, and even harder for rivals to neutralize or offset. As one senior Google employee put it, "[b]y charging non-transparently on both sides, we give ourselves some flexibility to react and counteract market changes. If we face tons of pricing pressure on the buy-side, we can fall back on the sell-side, and vice-versa."

## V.   TOLLING OF THE STATUTE OF LIMITATIONS

87.   Any applicable statute of limitations has been tolled by Defendant's knowing and active concealment of its Reserve Price Optimization program, as alleged herein. Through no fault or lack of diligence, Plaintiff and members of the class were deceived regarding the AdX exchange and could not reasonably discover the truth or Defendant's deception with respect to RPO.

88.   Plaintiff and Class members did not discover and did not know of any facts that would have caused a reasonable person to suspect that Defendant was concealing the RPO program, and could not have discovered the truth until, at the earliest, various states filed their Third Amended Complaint in *In re: Google Digital Advertising Antitrust Litigation*, Civil Action No.: 1:21-md-03010-PKC (S.D.N.Y.) on January 14, 2022, which for the first time included unredacted allegations concerning RPO. And it was not until that court issued its order on September 13, 2022, granting in part and denying in part Google's motion to dismiss that complaint, that it became clear advertisers would not be able to pursue claims based on Reserve Price Optimization in that case, although they were harmed by the practice.

89.   Defendant knowingly, actively, and affirmatively concealed the facts alleged herein, and the truth about its RPO program. Plaintiff and class members reasonably relied on Defendant's knowing, active, and affirmative concealment.

90.   For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Defendant's fraudulent concealment, and Defendant is estopped from relying on any statutes of limitations.

# VI.    CLASS ACTION ALLEGATIONS

91.    Plaintiff brings this action on behalf of himself and, under Federal Rules of Civil Procedure 23(a), (b)(2), (b)(3), and/or (c)(4), as representing the following class:

> All persons and entities in the United States that, from January 1, 2015 to September 5, 2019 (the "class period"), used Google's display advertising services to place an ad on a website operated by another entity (advertisers).

Excluded from the proposed class are: Defendants, their employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliated companies; class counsel and their employees; and the judicial officers and their immediate family members and court staff assigned to this case.

92.    The proposed class meets the requirements of Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), and/or (b)(3).

93.    The members of the class are so numerous that joinder is impracticable. The class includes at least hundreds of thousands of members that are widely dispersed throughout the country.

94.    Plaintiff's claims are typical of the claims of all class members. Plaintiff's claims arise out of a common course of conduct that gives rise to the claims of all other class members. Plaintiff and all class members were and will continue to be damaged in the same manner by the same wrongful conduct, namely Google's unfair business practices relevant to the market for search and display advertising services.

95.    Plaintiff is represented by counsel who are experienced and competent in the prosecution of class action litigation and have particular expertise with consumer protection litigation.

96.    Numerous questions of law or fact common to the class arise from Google's unfair business practices in the digital advertising market, including:

    a.    Whether Google engaged in Reserve Price Optimization and the related conduct alleged in this Complaint;

    b.    Whether Google engaged in unfair business practices that caused harm to advertisers;

    c.    Whether Google's conduct, including but not limited to its alleged deceptive conduct, violates California consumer protection statutory or other laws, including the laws of

other jurisdictions as asserted herein;

    d.   Whether Plaintiff and members of the proposed Class are entitled to damages, as well as punitive, exemplary, or multiple damages, due to Google's conduct as alleged in this Complaint, and if so, in what amounts;

    e.   Whether Plaintiff and other putative class members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief as requested in this Complaint.

97.    Questions of law and fact common to members of the class will predominate over any questions that may affect only individual class members because Google acted on grounds generally applicable to the class as a whole. For the same reason, class certification for purposes of adjudicating Plaintiff's claims for injunctive and declaratory relief is appropriate.

98.    This class action is superior to other alternatives for the fair and efficient adjudication of this controversy. Prosecuting the claims pleaded herein as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action.

99.    The prosecution of separate actions by individual class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Google.

100.    Plaintiff reserves the right to seek class certification with respect to common issues, including issues related to Google's duties or conduct.

## VII.    CAUSES OF ACTION

### FIRST CAUSE OF ACITON

### VIOLATIONS OF THE UNFAIR COMPETITION LAW
### Cal. Bus. & Prof. Code § 17200 *et seq.* (UCL)

101.    Plaintiff incorporates the allegations set forth above as if fully set forth herein.

102.    California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*, proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

103.    Google's practices also are unfair in violation of the UCL because they offend public

policy; are immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm, including from Google's inflated prices that advertisers paid and Google's underpayments to publishers, that outweighs by a wide margin any possible utility from the practices.

104.    Google's unlawful and unfair business practices actually and proximately caused Plaintiff and Class members to lose money. Specifically, the money advertisers lost when they paid the secretly inflated prices for display ads that Google charged them through its Reserve Price Optimization program, instead of publishers' true floors, as the AdX exchange was supposed to function.

105.    Plaintiff and Class members lack an adequate remedy at law to redress certain conduct of Google that violates the unfair prong of the UCL. Through the practices described herein, Google suppressed competition designed to produce fair market prices, misrepresented to advertisers that AdX operated as a second-price auction, and forced advertisers to pay more for impressions than they otherwise would have in a fair, unhindered market.

106.    Google intentionally and knowingly omitted material facts regarding the core operations and functions of the AdX auction platform with the intent to mislead Plaintiff and the other Class members.

107.    In transacting with Google and paying the inflated impression prices, Plaintiff and Class members were deceived by Google's intentional misrepresentations and material omissions related to the true, anticompetitive operation of the AdX platform.

108.    Plaintiff and the other Class members reasonably relied on Google's misrepresentations and omissions. They had no way of knowing that Google's representations were false, misleading, and incomplete. As alleged herein, Google engaged in a pattern of deception and public silence concerning its fraudulent practice of manipulating bids on its AdX exchange to increase Google's exchange fees.

109.    Google knew or should have known that its conduct violated the UCL and was illegal.

110.    Google owed Plaintiff and other Class Members a duty to disclose the truth about the AdX platform because Google:

      a.  Possessed exclusive knowledge of the true function of AdX that affected bidding rates;

      b.  Intentionally concealed how its Reserve Price Optimization program functioned from Plaintiff and other other Class Members; and/or

c.   Made incomplete representations by failing to warn the public or to publicly admit that the AdX exchange platform did not operate as a second-price auction.

111.   Plaintiff and Class members relied on Google's material partial representations and omissions.

112.   Google's conduct proximately caused injuries to Plaintiff and the other Class members who used Google's display advertising services to place an ad on a website operated by another entity and suffered harm as alleged herein.

113.   Plaintiff and other Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Google's conduct in that Plaintiff and Class members incurred costs, including overpaying for digital advertising space that was sole at a price that google artificially inflated.

114.   Google's unlawful acts and practices complained of herein affect the public interest.

115.   Plaintiff may lack an adequate remedy at law, if, for instance, damages resulting from their purchase of digital advertising space is determined to be an amount less than the full purchase price advertising space. Without compensation for the full purchase price of their advertising space through AdX, Plaintiff would be left short. Further, injunctive relief may be necessary to either: (i) deploy corrective measures to address future unfair and artificial price inflation on AdX; and/or (ii) require Google to provide full and accurate disclosures regarding the true operation of the AdX platform.

116.   Restitution and/or injunctive relief may also be more certain, prompt and efficient than other legal remedies requested herein. The return of the full purchase price, and an injunction requiring adequate disclosure of the true operating nature of Google's AdX exchange platform, will ensure that Plaintiff and other Class members are in the same place they would have been had Google's wrongful conduct not occurred, i.e., in the position to make an informed decision about the purchase of digital advertising space through AdX absent misrepresentations with the true bidding rates at their disposal.

117.   Accordingly, on behalf of the class, Plaintiff seeks injunctive relief, restitution, and reasonable attorneys' fees, as well as any other relief the Court may deem just or proper. The primary purpose of such injunctive relief will be to benefit the public from the lower prices and greater innovation that will prevail in competitive digital advertising markets in the absence of Google's monopoly.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SECOND CAUSE OF ACTION**
**FRAUD BY CONCEALMENT**
**(Based on California Law)**

118.    Plaintiff incorporates the allegations set forth above as if fully set forth herein.

119.    Plaintiff brings this claim on behalf of the Nationwide Class or, in the alternative, if the Court determines that California law does not apply to the Nationwide Class, Plaintiff bring this claim on behalf of a subclass of California residents of the Nationwide Class.

120.    Google intentionally concealed the true nature of the AdX platform.

121.    Google further affirmatively misrepresented to Plaintiff in advertising and other forms of communication that Google's digital search and display advertising platforms operated as a second-price auction when, in reality, Google operated more akin to a first-price auction and manipulated the auction platform's pricing mechanism to charge inflated trade rates through its Reserve Price Optimization program.

122.    Google knew the true nature of the AdX platform and its Reserve Price Optimization program when these representations were made.

123.    Plaintiff and other Class members purchased digital search and display advertising at inflated prices based on Google's misrepresentations and fraudulent omissions.

124.    Google had a duty to disclose that Google manipulated the Adx exchange fee after soliciting bids in the auction and accounting for rival exchanges' bids to win impressions that Google may have otherwise lost, because Plaintiff and other Class members relied on Google's material partial representations and omissions.

125.    As alleged herein, at all relevant times, Google held out the AdX platform as a second-price style auction. Google touted the benefits and advantages of trading in a second-price style auction, but nonetheless failed to disclose important facts related to the true nature of the AdX platform. This made Google's other disclosures about its ad exchange deceptive.

126.    The truth about Google's unfair auction practices was known only to Google; Plaintiff and other Class Members did not know of these facts and Google concealed these facts from Plaintiff and other Class Members.

- 22 -

127.    Plaintiff and the other Class members reasonably and justifiably relied upon Google's deception. They had no way of knowing that Google's representations were false, misleading, or incomplete. As consumers, Plaintiff and Class members did not, and could not, unravel Google's deception on their own and through ordinary diligence. Rather, Google intended to deceive Plaintiff and Class members by concealing the true facts about its ad exchange platform.

128.    Google's partial representations and omissions were material to consumers because they concerned qualities of AdX that affected the exchange's core functions and played a significant role in the value of the exchange platform.

129.    Google had a duty to disclose the true nature of AdX, as the circumstances of this case placed Google in a superior position as compared to Plaintiff because, among other things, consumers like Plaintiff trusted Google to provide accurate and non-misleading information about the ad exchange process, details of the true facts were known and/or accessible only to Google, Google had exclusive knowledge of the facts, and Google knew these facts were not known to or reasonably discoverable by Plaintiff or Class members.

130.    Because of the concealment and/or suppression of facts, Plaintiff and Class members sustained damages because they were induced to purchase digital advertising space at unfairly inflated prices compared to the fair market value.

131.    Google's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Class members' rights and the representations that Google made to them, in order to enrich Google. Google's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## THIRD CAUSE OF ACTION
## ALTERNATIVE COUNTS FOR VIOLATIONS OF STATE CONSUMER PROTECTION ACTS

132.    Plaintiff incorporates the allegations set forth above as if fully set forth herein.

133.    Plaintiff brings this Count in the alternative, if the Court determines that California law does not apply to the Nationwide Class. Count IV is brought by Plaintiff, individually and on behalf of

all similarly situated residents of the respective states, for violations of the state's consumer protection acts, including:

    a.   the Alabama Deceptive Trade Practices Act, Ala. Code § 8-19-1, *et seq.*;

    b.   the Arizona Consumer Fraud Act, A.R.S. § 44-1521, *et seq.*;

    c.   the Arkansas Deceptive Trade Practices Act, Ark. Code § 4-88-101, *et seq.*;

    d.   the Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-101, *et seq.*;

    e.   the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. 16 § 501.201, *et seq.*;

    f.   the Georgia Fair Business Practices Act, Ga. Code Ann. § 10-1-390, *et seq.*;

    g.   the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 501/1, *et seq.*;

    h.   the Indiana Deceptive Consumer Sales Act, Ind. Code § 24-5-0.5-2, *et seq.*;

    i.   the Iowa Private Right of Action for Consumer Frauds Act, Iowa Code § 714H

    j.   the Louisiana Unfair Trade Practices and Consumer Protection Law, La. Rev. Stat. Ann. § 51:1401, *et seq.*;

    k.   the Kentucky Consumer Protection Act, Ky. Rev. Stat. Ann. § 367.110, *et seq.*;

    l.   the Maryland Consumer Protection Act, Md. Comm. Code § 31-301, *et seq.*;

    m.   the Massachusetts Consumer Protection Act, Mass. Gen. Laws Ann. Ch. 93A, § 1, et seq.;

    n.   the Michigan Consumer Protection Act, Mich. Comp. Laws Ann. § 445.901,

    o.   *et seq.*;

    p.   the Minnesota Consumer Fraud Act, Minn. Stat. § 325F.68, *et seq.* and Minn. 3 Stat. §§ 8.31, *et seq.*;

    q.   the Missouri Merchandise Practices Act, Mo. Rev. State § 407.010, *et seq.*;

    r.   the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 41.600, *et seq.*;

    s.   the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1, *et seq.*;

    t.   the New Mexico Unfair Practices Act, N.M. Stat. Ann. § 57-12-2, *et seq.*;

    u.   the New York Consumer Protection from Deceptive Acts and Practices, N.Y. Gen.

Bus. Law § 349, *et seq.*;

v.  the North Carolina Unfair Trade Practices Act, N.C. Gen. Stat. Ann. § 75-1.1, *et seq.*;

w.  the Ohio Consumer Sales Practices Act, Ohio Rev. Code §§ 1345.01, *et seq.*;

x.  the Oregon Unlawful Trade Practices Act, Or. Rev. Stat. § 646.608, *et seq.*;

y.  the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, *et seq.*;

z.  the South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10, *et seq.;*

aa. the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101, *et seq.*;

bb. the Texas Deceptive Trade Practices-Consumer Protection Act, Tex. Code Ann., Bus. & Con. § 17.41, *et seq.*;

cc. the Vermont Consumer Fraud Act, Vt. Stat. Ann. Tit. 9, § 2451, *et seq.*;

dd. the Virginia Consumer Protection Act of 1977, Va. Code Ann. § 59.1-199, *et seq.*; and

ee. the West Virginia Consumer Credit and Protection Act, W. Va. Code § 46A, *et seq.*

134.  The unfair and deceptive practices engaged by Google described above, occurring in the course of conduct involving trade or commerce, constitute unfair methods of competition and unfair or deceptive acts or practices within the meaning of each of the above enumerated statutes. Plaintiff and other Class members reasonably and justifiably relief upon these unfair and deceptive practices, which caused injury to Plaintiff and other Class members.

135.  Google's acts and practices were unfair and knowingly created a likelihood of confusion or misunderstanding of material facts concerning Google's ad exchange platform and misled, deceived, or damaged Plaintiff and members of the Class in connection with the sale of digital search and display advertising space. Google's conduct also constituted the intended use or employment of deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission in connection with the sale or advertisement of goods or services.

136.  Plaintiff, on behalf of himself and the Class members, seek monetary damages, treble damages, and such other and further relief as set forth in each of the above-enumerated statutes.

1
2
3

## FOURTH CAUSE OF ACTION
### ALTERNATIVE COUNT FOR FRAUD BY CONCEALMENT
### (Based on Individual State Law)

4   137.   Plaintiff incorporates the allegations set forth above as if fully set forth herein.

5   138.   Google intentionally concealed the true nature of the AdX platform.

6   139.   Google further affirmatively misrepresented to Plaintiff in advertising and other forms of
7   communication that Google's digital search and display advertising platforms operated as a second-
8   price auction when, in reality, Google operated more akin to a first-price auction and manipulated the
9   auction platform's pricing mechanism to charge inflated trade rates.

10   140.   Google knew the true nature of the AdX platform when these representations were made.

11   141.   Plaintiff and other Class members purchased digital search and display advertising at
12   inflated prices based on Google's misrepresentations and fraudulent omissions.

13   142.   Google had a duty to disclose that Google manipulated the Adx exchange fee after
14   soliciting bids in the auction and accounting for rival exchanges' bids to win impressions that Google
15   may have otherwise lost, because Plaintiff and other Class members relied on Google's material partial
16   representations and omissions.

17   143.   As alleged herein, at all relevant times, Google held out the AdX platform as a second-
18   price style auction. Google touted and continues to tout the benefits and advantages of trading in a
19   second-price style auction, but nonetheless failed to disclose important facts related to the true nature of
20   the AdX platform. This made Google's other disclosures about its ad exchange deceptive.

21   144.   The truth about Google's unfair auction practices was known only to Google; Plaintiff
22   and other Class Members did not know of these facts and Google concealed these facts from Plaintiff
23   and other Class Members.

24   145.   Plaintiff and the other Class members reasonably and justifiably relied upon Googles
25   deception. They had no way of knowing that Google's representations were false, misleading, or
26   incomplete. As consumers, Plaintiff and Class members did not, and could not, unravel Google's
27   deception on their own and through ordinary diligence. Rather, Google intended to deceive Plaintiff and
28   Class members by concealing the true facts about its ad exchange platform.

146.    Google's partial representations and omissions were material to consumers because they concerned qualities of AdX that affected the exchange's core functions and played a significant role in the value of the exchange platform.

147.    Google had a duty to disclose the true nature of AdX, as the circumstances of this case placed Google in a superior position as compared to Plaintiff because, among other things, consumers like Plaintiff trusted Google to provide accurate and non-misleading information about the ad exchange process, details of the true facts were known and/or accessible only to Google, Google had exclusive knowledge of the facts, and Google knew these facts were not known to or reasonably discoverable by Plaintiff or Class members.

148.    Because of the concealment and/or suppression of facts, Plaintiff and Class members sustained damages because they were induced to purchase digital advertising space at unfairly inflated prices compared to the fair market value.

149.    Google's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Class members' rights and the representations that Google made to them, in order to enrich Google. Google's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## FIFTH CAUSE OF ACTION
## UNJUST ENRICHMENT

150.    Plaintiff incorporates the allegations set forth above as if fully set forth herein.

151.    Plaintiff and Class members unwittingly conferred a benefit upon Google by paying inflated prices for digital search and display advertising platforms that Google misrepresented as a second-price auction.

152.    Google was enriched by Plaintiff's and Class members overpayment to Google's digital search and display advertising platforms.

153.    It would be inequitable for Google to retain the benefits it has unjustly received. Therefore, as a result of Google's actions, Plaintiff and Class members seek an order that Google disgorge the profits and other benefits it has unjustly obtained.

## VIII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the class defined herein, respectfully requests that this Court:

A.    Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3), direct that reasonable notice of this action be given to the class, appoint Plaintiff as named representative of the Class, and appoint the undersigned Plaintiff's counsel as class counsel;

B.    Enter judgment against Google and in favor of Plaintiff and the Class;

C.    Enter injunctive relief to correct Google's unfair business conduct;

D.    Award damages, restitution, and/or disgorgement to the class in an amount to be determined at trial, plus interest in accordance with law;

E.    Award Plaintiff and the Class their costs of suit, including reasonable attorneys' fees, as provided by law; and

F.    Award such further and additional relief as is necessary to redress the harm caused by Google's unlawful conduct and as the Court may deem just and proper under the circumstances.

## IX.    DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury on all matters so triable.

Dated: September 15, 2022

Respectfully submitted,

By:    */s/ Tina Wolfson*
Tina Wolfson (SBN 174806)
*twolfson@ahdootwolfson.com*
Robert Ahdoot (SBN 172098)
*rahdoot@ahdootwolfson.com*
Theodore W. Maya (SBN 223242)
*tmaya@ahdootwolfson.com*
Carlynne A. Wagner (*pro hac vice* forthcoming)
*cwagner@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
2600 West Olive Avenue, Suite 500
Burbank, California 91505
Tel: (310) 474-9111; Fax: (310) 474-4521

*Attorneys for Plaintiff and the Putative Class*